IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DONNIE L. WILLIAMS,
     Petitioner,

vs.                            Case No.:  3:10cv238/LAC/EMT

KENNETH S. TUCKER,[1]
     Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

     This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (docs. 26, 28).  Petitioner filed a reply (doc. 30).

     The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.     BACKGROUND AND PROCEDURAL HISTORY

     The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 28).[2]  Petitioner was indicted in the Circuit Court in and for Escambia County, Florida, Case No. 2003-CF-001056, on one count of first degree premeditated or felony murder with

---

[1] Kenneth S. Tucker succeeded Edwin G. Buss as Secretary for the Department of Corrections.  Secretary Tucker is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 28).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

a firearm (Count 1), one count of burglary of an occupied dwelling with assault or battery and while armed (Count 2), and one count of robbery with a firearm (Ex. A).  The offense conduct occurred on March 10, 2003 (*id.*).  Following a jury trial on June 7 and 10, 2004, Petitioner was found guilty of first degree felony murder with a firearm, burglary of an occupied dwelling with assault or battery and while armed, and robbery with a firearm (Exs. B, C).  On June 10, 2004, Petitioner was adjudicated guilty and sentenced to life imprisonment without the possibility of parole on Count 1, and concurrent terms of life imprisonment on Counts 2 and 3, to run concurrently with the life sentence on Count 1, and with pre-sentence credit of 459 days (Ex. D).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D04-2995 (Ex. E).  Petitioner's counsel filed a brief, pursuant to Anders v. California, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court (*id.*).  The First DCA affirmed the judgment per curiam without written opinion on May 4, 2006, with the mandate issuing May 31, 2006 (Ex. F).  Williams v. State, 928 So. 2d 1225 (Fla. 1st DCA 2006) (Table).  Petitioner did not seek further review.

On May 17, 2006, Petitioner filed a motion to modify or reduce sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. G).  The state circuit court denied the motion in an order rendered July 6, 2006 (Ex. H).

On July 14, 2006, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I).  The state circuit court summarily denied the motion (Ex. M).  Petitioner appealed the decision to the First DCA, Case No. 1D07-2205 (Ex. P). The First DCA affirmed the decision per curiam without written opinion on October 24, 2007, with the mandate issuing December 18, 2007 (Exs. U, X).  Williams v. State, 969 So. 2d 377 (Fla. 1st DCA 2007) (Table).  Petitioner petitioned for review in the Florida Supreme Court, Case No. SC07-2433 (Ex. Z).  The Florida Supreme Court dismissed the petition for lack of jurisdiction on January 3, 2008 (Ex. AA).  Williams v. State, 974 So. 2d 388 (Fla. 2008) (Table).

On May 14, 2008, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D09-0505, alleging ineffective assistance of appellate counsel (Ex. BB).  The First DCA denied the petition on the merits on October 6, 2009, and denied Petitioner's motion for rehearing

on December 3, 2009 (Exs. EE, FF, GG).  Williams v. State, 22 So. 2d 623 (Fla. 1st DCA 2009).
Petitioner petitioned for  review in the Florida Supreme Court, Case No. SC09-2081 (Ex. HH).  The
Florida Supreme Court dismissed the petition for lack of jurisdiction on January 22, 2010 (Ex. II).
Williams v. State, 28 So. 2d 46 (Fla. 2010) (Table).

On February 16, 2009, while the state habeas petition was pending, Petitioner filed a second
Rule 3.850 motion (Ex. JJ).  The state circuit court summarily denied the motion (Ex. KK).
Petitioner appealed the decision to the First DCA, Case No. 1D09-3624 (Ex. LL).  The First DCA
affirmed the decision per curiam without written opinion on October 21, 2009, with the mandate
issuing December 18, 2009 (Exs. NN, QQ).  Williams v. State, 22 So. 3d 545 (Fla. 1st DCA 2009)
(Table).  Petitioner petitioned for  review in the Florida Supreme Court, Case No. SC09-2079 (Ex.
RR). The Florida Supreme Court dismissed the petition for lack of jurisdiction on December 8, 2009
(Ex. SS).  Williams v. State, 25 So. 3d 562 (Fla. 2009) (Table).

On February 22, 2010, Petitioner filed a motion to correct illegal sentence, pursuant to Rule
3.800(a) of the Florida Rules of Criminal Procedure (Ex. TT).  The state circuit court summarily
denied the motion (Ex. UU).  Petitioner appealed the decision to the First DCA, Case No. 1D10-
2118 (Ex. VV).  The First DCA affirmed the decision per curiam without written opinion on June
11, 2010, with the mandate issuing July 7, 2010 (Exs. VV, WW).  Williams v. State, 37 So. 3d 855
(Fla. 1st DCA 2010) (Table).

Petitioner filed the instant federal habeas action on July 1, 2010 (doc. 1).  Respondent
concedes the petition is timely (doc. 26 at 8).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for
a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court"
upon a showing that his custody is in violation of the Constitution or laws of the United States.  As
the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for
habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and
Effective Death Penalty Act of 1996 ("AEDPA").  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.
In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law

occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the

petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill, 2010 WL 609844, at *18.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.   Ground One:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of counsel based on counsel's failure to object to the State's violation of the court's suppression order."

Petitioner asserts that prior to trial, defense counsel successfully pursued a motion to suppress Petitioner's statements to police in a taped interview (doc. 1 at 6).  Petitioner states Detective John Sanderson had consistently stated in depositions and other discovery material that Petitioner did not make any statements other than the taped interview (*id.*).  Petitioner contends Detective Sanderson violated the court's suppression order by testifying as follows:

> He [Petitioner] said they were there to get weed and they kicked the door.
> He admitted to entering the house . . . . He said he heard a girl screaming in the back
> left side of the house . . . and he said the black male had conversations with the girl
> and then the black male put the shotgun in the sink and turned the water on.  He told
> us that the black male had blood on him—on his face and hands—and he also went
> on to tell us that he knew the girl was Jessica . . . . He said that the black male then
> said, quote, she's done, I fucked her up, end of quote.  And he went on to tell us that
> he and Billy did help put the safe in the car and then they went back to Ryan Holle's
> house . . . and at that location he told everyone there that quote, they fucked her up,
> end of quote.

(*id.*).  Petitioner contends defense counsel should have objected to this testimony on the ground that

it violated the court's suppression order (*id.*).  He argues he was prejudiced by counsel's error,

because his defense was that the crimes were independent acts of co-defendants, which was

supported by eyewitness testimony that Petitioner was in a vehicle outside the house when the other

persons went into the house (*id.*).  Petitioner contends had counsel objected to Sanderson's

testimony, there is a reasonable probability the outcome of trial would have been different (*id.* at 7).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 14).  Respondent contends

Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an

unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly

established federal law (*id.* at 14–25).

> 1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in

Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must

show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's

deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If

Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.

*Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's

performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir.

2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus

of inquiry under the performance prong is "reasonableness under prevailing professional norms."

Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly

deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground IV(A) in his Rule 3.850 motion (Ex. I at 16–19).  The state circuit court identified the Strickland standard as the appropriate legal standard for reviewing Petitioner's claims (Ex. M at 59–60).  The court denied the claim on the following grounds:

> With regard to Defendant's statements testified to by Sanderson and argued by the State, Defendant acknowledges that the Court's ruling on the motion to suppress "was restricted to the video and not to what defendant told the investigator before he was taped."[FN 32]
>
> Defendant has failed to demonstrate that the statements offered were in fact offered from the suppressed videotape and not from what he told the investigators before he was taped.  Indeed, it is clear Defendant made statements prior to being videotaped.  Investigator Kilgore[FN 33] is heard on the tape in question saying, "What I want to do is put **everything that we just talked about** on tape so there's no misunderstanding."[FN 34]  Kilgore states that the taped interview begins at 14:32 hours (2:32 p.m.)[FN 35] Later, Investigator Kilgore refers again to "you told me something earlier before we turned the tape on . . ."[FN 36]  Defendant refused

to give the statement again, and subsequently said, "I told you pretty much what ya'll need to know to apprehend the person who did this, right?"[FN 37]

Sanderson's trial testimony is brief, and refers specifically to an interview at the Escambia County Sheriff's Office which began at "approximately 11:50 in the morning"[FN 38] after Defendant was given his <u>Miranda</u> warnings.  As noted previously, Defendant's taped interview did not begin until approximately 2:30 p.m. Defendant has failed to demonstrate that the State or Sanderson exceeded the limitations specified by the Court in its ruling on the motion to suppress, either during testimony or closing argument, and therefore, counsel cannot be deemed ineffective for failing to object.

FN 32:  <u>See</u> Defendant's motion, page 18.  <u>See also</u> Attachment 5, motion to suppress transcript, page 41.  The Court ruled that "assuming that the testimony is going to be that he was advised of his <u>Miranda</u> warnings and he gave them a pre-video statement, I will allow that testimony to come in."

FN 33:  Both Investigator Sanderson and Investigator Kilgore were present during the Interview of Defendant.  <u>See</u> Attachment 5, motion to suppress transcript, page 10.

[FN 34–37: references to transcript of hearing on motion to suppress]

[FN 38:  reference to trial transcript]

(Ex. M at 68–69).

Petitioner argued this issue on appeal of the circuit court's decision (Ex. P).  The First DCA affirmed without written opinion (Ex. U).

The state court record demonstrates that prior to trial, defense counsel filed a motion to suppress, alleging therein:  "The statement made by the Defendant to Investigator Sanderson and Investigator Kilgore on March 10, 2003, at the Escambia County Sheriff's Office was not made after a voluntary waiver of his constitutional rights.  In addition, the Defendant was under the influence of alcohol and/or drugs at the time of the statement and [the statement] should not be admissible in court." (Ex. XX).  Defense counsel requested that the court suppress all statements Petitioner made to law enforcement on March 10, 2003 (*id.*).

The trial court held an evidentiary hearing on the motion to suppress (Ex. YY).  Prior to the taking of testimony, counsel agreed to the trial court's listening to a relevant portion of Petitioner's

videotaped statement (*id.* at 1–16).  According to the transcript of the videotape, Petitioner told Officer Kilgore and Investigator Sanderson he wished to have his lawyer present before he made a recorded statement (*id.* at 4–15).  However, it is also clear from the transcript that Petitioner had already made an earlier, unrecorded statement to the investigators after waiving his <u>Miranda</u> rights (*id.* at 7–14).

After viewing the videotape, the trial court heard testimony from Investigator Sanderson, Officer Kilgore, and Petitioner (Ex. YY).  Officer Kilgore testified that when he first came into contact with Petitioner, he advised him of his <u>Miranda</u> warnings, and Petitioner stated he was willing to talk to him without a lawyer present (*id.* at 18–19).  On cross-examination, Officer Kilgore was asked about a statement he made in a deposition when asked whether Petitioner had been interviewed prior to the videotaped interview (*id.* at 20–21).  Officer Kilgore answered, "No, sir.  It would have been—the pre-interview would be on the videotape?" (*id.*).  Officer Kilgore answered that Investigator Sanderson may have notes regarding a pre-recorded interview (*id.*).

Investigator Sanderson testified he interviewed Petitioner prior to the videotaped interview and prepared a report regarding the interview (Ex. YY at 25–29).  Petitioner testified he had consumed a considerable amount of alcohol and drugs prior to being questioned by the police, and this affected his ability to understand what was going on (*id.* at 30–34).

At the conclusion of taking testimony, the court entertained argument from counsel (Ex. YY at 35–38).  The court then ruled that the statements on the videotape were subject to suppression (*id.* at 38–39).  The court asked defense counsel whether he was also attacking Petitioner's pre-recorded statement, and defense counsel responded:

> Judge, the—whatever they called the—there's some conflicting statements, Judge, that were made by the officers.  And I recognize that in Mr. Sanderson's report that's there, and I don't—that was not recorded.  It is mentioned in his report.  And I don't believe and have not seen any written waiver of <u>Miranda</u> rights on that statement. I don't know if the State has any.  I'm assuming they don't.  But I assume that Investigator Sanderson would testify that he did do that, Judge.  Although during the course of his deposition he indicated there was no other statement other than what was contained on the video.

(*id.* at 112–14).

The prosecutor asked for clarification as to whether the court's ruling was restricted to the videotaped statement or included Petitioner's statements to police before the videotape was turned on (Ex. YY at 114).  The trial court ruled:  "Assuming—and I think I got that impression, assuming that the testimony is going to be that he was advised of his <u>Miranda</u> warnings and he gave them a pre-video statement, I will allow that testimony to come in." (*id.*).  The record reflects the prosecutor then provided defense counsel a copy of a rights waiver form signed by Petitioner and the officers (*id.*).

At trial, Investigator John Sanderson testified that four individuals were arrested and charged with the murder of the victim, Jessica Snyder (Ex. B at 134–35).  Investigator Sanderson testified that he interviewed Petitioner as part of his investigation:

> Q [by the prosecutor, Mr. Rimmer].  Now as part of your investigation, did you interview the defendant Donnie Williams?
>
> A.  Yes, sir.
>
> Q.  Where did that take place?
>
> A.  At the Escambia County Sheriff's Office.
>
> Q.  And was that on the morning of March the 10th?
>
> A.  Yes, it was.
>
> Q.  Approximately what time?
>
> A.  Approximately 11:50 in the morning.
>
> Q.  What, if anything, did Donnie Williams tell you?
>
> A.  We started talking to him.  He said that there had been a get together the previous evening, talking about Ryan Holle's house.
>
> > MR. HILL [defense counsel]:  May we approach the bench, please?
> >
> > THE COURT:  All right.  Counsel approach with the court reporter.
> >
> > (At the bench:

MR. HILL:  Judge, I'm not certain if I'm really going to object.  I understand it is going to come in but I don't know that, there's been no advisement of his rights or anything else at this point in time.

MR. RIMMER:  I'll go through that if you want me to.

MR. HILL:  I would just prefer that for the record.

THE COURT:  Lay the predicate so it is clean.

MR. RIMMER:  I'll do that.

(Bench conference concluded.)

Q [by Mr. Rimmer].  Officer Sanderson, let me ask you this, let's back up a little bit.  Before you questioned Donnie Williams, did you advise him of what are known as his Miranda warnings?

A.  Yes, sir, we did.

Q.  Did he agree to talk to you without an attorney present?

A.  Yes, he did.

Q.  And did he, in fact, talk to you?

A.  Yes.

Q.  All right.  You started telling us about that conversation.  I believed you indicated there had been a get together the night before?

A.  Yes. They said they—he had been at a get together the previous evening at Ryan Holle's house.

Q.  Let me ask you this.  Did you ask him if he had been anywhere on the morning of March the 10th?

A.  Yes, we did.

Q.  What did he say?

A.  He said he had not been anywhere the night before or that morning, he said he had been asleep.

Q.  Did he at some point change his story?

A.  Yes, he did.

Q.  Then what did he say?

A.  He started out by saying we went to get some weed.  He said that they left the house that morning at, with two black males and Billy Allen.  It was him, two black males and Billy Allen.

Q.  Now is this house on Pelham Road?

A.  Pelham Road and they went to the house on Wisteria.  He said that the two black males went up and kicked the front door of the house and he heard screaming and then they came out saying she's dead, they handled it.  And he said they also had the safe with them at that time when they were coming out.

Q.  Did he say he went inside the house?

A.  At that particular time he did not.

Q.  Did he eventually say he went inside the house?

A.  Yes, he did.

Q.  Now did he indicate whether or not he heard the screaming while he was inside the house?

A.  Initially he didn't but as we continued talking to him, he changed his statement a little bit more.

Q.  Okay.  What did he say about that?

A.  He said they were there to get some weed and they kicked the door.  He admitted to entering the house after the black males kicked the door.  He said he heard a girl screaming in the back left side of the house.

Q.  This is while he's inside the house?

A.  Right.

Q.  Okay.

A.  And had, and he said the black male had conversations with the girl and then the black male put the shotgun in the sink and turned the water on.  He told us that the black male had blood on him and on his face and hands and he also went on to tell us that he knew the girl as Jessica.

Q.  Williams knew her?

A.  Yes.  He said the black male then said quote she's done, I fucked her up, end of quote.  And he went on to tell us that he and Billy did help put the safe in the car and then they went back to Ryan Holle's house on Pelham Road and at that location he told everybody there that quote, they fucked her up, end of quote.

(Ex. B at 137–41).

The record supports the state court's determination that the trial court granted the motion to suppress only as to Petitioner's statements during the videotaped interview.  The record also supports the state court's determination that Investigator Sanderson's testimony regarding Petitioner's statements concerned Petitioner's statements to investigators prior to the videotaped interview, not his statements during the suppressed videotaped interview.  Petitioner thus failed to show that defense counsel had a meritorious basis to object to Investigator Sanderson's testimony on the ground that it violated the suppression order.  Counsel's performance may not be deemed deficient for failing to make a nonmeritorious argument.  *See* Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994) ("It is axiomatic that the failure to raise non-meritorious issues does not constitute ineffective assistance.").  Moreover, Petitioner failed to show a reasonable probability that an objection by counsel on the ground that Sanderson's testimony violated the suppression order would have been properly sustained by the trial court.  Therefore, Petitioner failed to satisfy either prong of the Strickland standard.

Petitioner failed to demonstrate that the state court's adjudication of his claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to habeas relief on Ground One.

B.      Ground Two:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of counsel based on counsel conceding Petitioner's guilt in front of the jury during trial."

Petitioner asserts that during opening statements, defense counsel told the jury, "[Petitioner] and the others went over there to steal a safe. . . . He was committing a burglary . . . . If you feel

based on the evidence he's guilty of burglary, which I've already told you that, yes." (doc. 1 at 7). Petitioner states the prosecutor requested a bench conference to inquire as to whether Petitioner consented to defense counsel's concession (*id.*). Petitioner states the trial court asked him whether defense counsel had discussed this concession with him and whether he agreed to the concession to the burglary offense (*id.*). Petitioner states he advised the trial court that counsel had discussed this with him (*id.*). Petitioner contends although counsel discussed with him counsel's desire to concede to the burglary offense, counsel failed to advise him that doing so essentially constituted a concession to felony murder (*id.*). Petitioner states it was undisputed at trial that the victim's death was caused by the actions of the co-defendants; therefore, when counsel conceded Petitioner's participation in the burglary, he also "de facto" conceded guilt to felony murder (*id.*). Petitioner contends counsel's failure to advise him of the effect of the concession rendered his consent to concede guilt to burglary unknowing and involuntary (*id.*). He contends there is a reasonable probability the result of his trial would have been different had counsel advised him that the concession of guilt to burglary essentially constituted a concession to felony murder, because if counsel had properly advised him, he would not have agreed to the concession of guilt to burglary (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 27). Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 27–30).

   1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

   2. Federal Review of State Court Decision

Petitioner raised this claim as Ground III in his Rule 3.850 motion (Ex. I at 12–16). The state circuit court denied the claim on the following grounds:

> In Defendant's third claim, Defendant alleges that he was denied effective assistance of counsel because counsel conceded he was guilty of burglary in opening arguments. This claim is refuted by the record. Having heard counsel's opening argument, which included a concession that Defendant was guilty of burglary, the

Court inquired personally of Defendant whether he agreed with the tactic. The following exchange occurred:

> **State:** I want to make sure that Donnie Williams agreed with the strategy of conceding guilty as to burglary.
>
> **Counsel:** I talked it over with him, Judge. He's well aware of that.
>
> **State:** I think we should inquire of him.
>
> . . . .
>
> (Defendant sworn)
>
> **The Court:** Your attorney in his opening statement essentially admitted that you participated in the burglary, do you understand that?
>
> **Defendant:** Yes, ma'am.
>
> **The Court:** Did he talk to you about that strategy?
>
> **Defendant:** Yes, ma'am.
>
> **The Court:** And is it with your consent that he went ahead and admitted that particular charge?
>
> **Defendant:** Yes, ma'am.[FN 30]

As noted previously, Defendant also acknowledged at the close of the evidence that he was "satisfied with the defense that Mr. Hill has put on in this case."[FN 31]

Despite Defendant's assertion to the contrary, defense counsel's failure to obtain a defendant's express consent to a strategy of conceding guilt does not automatically render counsel's performance deficient. See Florida v. Nixon, 543 U.S. 175, 125 S. Ct. 551 (2004). Furthermore, although Defendant now attempts to disavow his sworn statements as involuntary, arguing that he was "coerced and misled" into admitting his guilt to burglary, the Court is not convinced. "An appellant is not entitled to go behind sworn representations made to the court in a postconviction proceeding [ ]." Davis v. State, 938 So. 2d 555, 557 (Fla. 1st DCA 2006). Defendant is not entitled to relief on the basis of his third claim.

[FN 30:  reference to trial transcript]

[FN 31: reference to trial transcript]

(Ex. M at 67–68).

Petitioner argued this issue on appeal of the circuit court's decision (Ex. P). The First DCA affirmed without written opinion (Ex. U).

Conceding a client's guilt can be a reasonable trial strategy. *See* <u>Florida v. Nixon</u>, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). When counsel's strategy, given the evidence bearing on the defendant's guilt, is in his client's best interest and when the <u>Strickland</u> standard is satisfied, no tenable claim of ineffective assistance remains even where a defendant did not expressly consent to the strategy. *Id.*, 543 U.S. at 192.

The following evidence was adduced at Petitioner's trial. The victim's 13-year-old sister testified that Petitioner (who is white) was one of the three men (two of whom were black and one was white) who came to her house at 8:20 a.m. on March 10, 2003, and briefly spoke with her sister, Jessica (Ex. B at 89–91). She testified she recognized Petitioner as "Donnie Williams" (*id.* at 89–90). She testified the men left on foot, and she left for school ten (10) minutes later (*id.* at 91).

Mr. Russell Scarritt, a friend of the Snyders, testified he drove by the Snyders's house that morning and observed two black men standing at the front door talking to Jessica Snyder (Ex. B at 93–95). Mr. Scarritt testified he did not see a white man with the two black men (*id.*).

Mr. John Shenberger, the Snyders's neighbor, testified that at 8:30 a.m. that morning, he observed two black men in the Snyders's front yard (Ex. B at 111–17). He testified that approximately ninety (90) seconds later, he observed the two black men carrying a large black object out of the house (*id.*). He observed the two black men and two white men (one of whom he recognized as co-defendant Billy Allen) place the object into a car driven by Billy Allen (*id.*). He testified he telephoned Christine Snyder and told her about the men (*id.*).

Christine Snyder testified she lived with her husband and two daughters, one of whom was Jessica, in their home (Ex. B at 95–107). She testified she worked with Billy Allen and sometimes gave him marijuana (*id.*). Ms. Snyder testified Billy Allen knew that she kept marijuana in a safe in the home (*id.*). She testified the safe was in the same bedroom with a gun rack and three guns, one of which was a shotgun (*id.*). Ms. Snyder testified that Petitioner worked with Jessica (*id.*). She testified she went home after Mr. Shenberger called her (*id.*). She entered the kitchen and saw water

running in the sink and the shotgun laying across the sink (*id.*).  She walked towards Jessica's room and saw Jessica's body on the floor (*id.*).  Ms. Snyder testified she later discovered the safe was missing from the bedroom (*id.*).

As previously noted, Investigator Sanderson testified Petitioner told him he and the co-defendants went to the Snyders's home to "get some weed," and after two co-defendants kicked the door open, he and the two co-defendants entered the home and stole a safe (Ex. B at 140–41).

Under Florida law, the felony murder rule and the law of principals combine to make a felon liable for the acts of a co-felon.  <u>Bryant v. State</u>, 412 So.2d 347, 350 (Fla. 1982).  Nevertheless, under the independent act doctrine, a defendant whose co-felon exceeds the scope of, and acts independently of, the original common plan is exonerated from any punishment imposed as a result of the co-felon's independent act.  <u>Ray v. State</u>, 755 So. 2d 604, 609 (Fla. 2000); <u>Beachy v. State</u>, 837 So. 2d 1152, 1152–53 (Fla. 1st DCA 2003); <u>Thomas v. State</u>, 787 So. 2d 27, 29 (Fla. 2d DCA 2001).

The theory of defense presented by defense counsel was that even though Petitioner and the co-defendants went to the Snyders's home with the intention of breaking in and stealing a safe, the co-defendants exceeded the scope of the burglary plan and acted independently of that plan by killing Jessica Snyder.  Defense counsel presented a cogent defense during his opening statement, vigorous cross-examination of witnesses, and closing argument.  Additionally, counsel requested a jury instruction on the independent act doctrine, and the trial court gave the instruction.[4]  Having

---

[4] The court instructed the jury as follows, in relevant part:

> If you find the crimes alleged were committed, an issue in this case is whether the crimes of murder and/or robbery were the independent acts of a person other than the defendant.  An independent act occurs when a person other than the defendant commits or attempts to commit a crime which the defendant did not intend to occur and in which the defendant did not participate and which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

> If you find the defendant was not present when the crimes of murder and/or robbery occured, that does not in and of itself establish that the murder and/or robbery was an independent act of another.  If you find that the murder and/or robbery was an independent act of Charles Miller, then you should find Donnie Lee Williams not guilty of the crimes of murder and/or robbery.

(Ex. B at 198)

presented an "independent act" defense to the robbery and murder charges, counsel's conceding Petitioner's guilt to burglary (a strategy to which Petitioner admittedly consented) did not constitute a concession to felony murder.  Therefore, counsel did not misadvise Petitioner regarding the effect of the concession of guilt to burglary.

Further, admitting guilt to the burglary was a reasonable trial strategy in light of the evidence presented at trial.  The State was still required to present competent, admissible evidence establishing the essential elements of felony murder and robbery beyond a reasonable doubt.  By conceding that Petitioner committed at most the crime of burglary, defense counsel was able to achieve credibility with the jury, highlight weaknesses in the State's evidence regarding the felony murder and robbery offenses, and attempt to persuade the jury to find Petitioner not guilty as to the most serious offense, which was a capital felony.  In light of the vigorous defense mounted by Petitioner's counsel, it would be unreasonable to conclude that the statements complained of by Petitioner or the defense strategy in general rose to the level of deficient performance by defense counsel.  *See* McNeal v. Wainwright, 722 F.2d 674, 675–76 (11th Cir. 1984) (holding that defense counsel's argument in first-degree murder prosecution without defendant's consent, which suggested that defendant was "at best" guilty of manslaughter, was made as a proper tactical decision, not amounting to unconstitutional representation); *see also, e.g.*, Vilme v. McNeil, No. 08-23138-CIV, 2010 WL 430762, at *21–23 (S.D. Fla. Feb. 5, 2010) (holding that counsel was not ineffective by conceding guilt to underlying felony of felony murder charge (attempted robbery) in opening statement and arguing petitioner should not be found guilty of murder because murder was independent act of co-defendant, where undisputed evidence showed petitioner was present at scene of armed robbery and participated in attempted armed robbery).

In the absence of a showing of deficient performance by counsel, Petitioner failed to satisfy the Strickland standard.  Therefore, the state court's adjudication of this claim was not an unreasonable application of Strickland.

C.     Ground Three:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of counsel based on counsel's misadvice, threats, and coercion concerning Petitioner's desire to testify at trial."

Petitioner asserts he informed defense counsel he wished to testify at trial (doc. 1 at 8).  He states defense counsel told him his testimony was unnecessary, and if he testified, counsel would

withdraw from representation (*id.*).  Petitioner states he informed the trial court he was not going to testify, but it was based upon his belief that counsel would be permitted to withdraw, and Petitioner would be forced to represent himself throughout the rest of the trial, which he was not capable of doing (*id.*).  Petitioner states he was prejudiced by counsel's threat, because he otherwise would have testified, and the outcome of trial would have been different (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 31).  Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 31–34).

      1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground VI in his Rule 3.850 motion (Ex. I at 24–27).  The state circuit court denied the claim on the following grounds:

> In Defendant's sixth claim, Defendant alleges that counsel was ineffective "due to counsel's misadvice, threats and coercion as to him testifying in his own behalf."  Specifically, Defendant alleges that counsel told him that if he testified, he would withdraw and Defendant would have to represent himself.  Defendant also says that counsel never informed him as to the option of testifying.
>
> Defendant's claims are refuted by the record.  The record reflects that both counsel and the Court discussed with Defendant his right to testify on his own behalf.  After the close of the State's case, the following exchange occurred:
>
> > **Mr. Hill**:  Your Honor, I just need a few moments to talk to my client.
> >
> > **The Court**:  Okay.
> >
> > **Mr. Hill**:  Can I just do that here?
> >
> > **The Court**:  Yes, just don't forget you want to hold that little mike down.
> >
> > (Off record discussion between Mr. Hill and Defendant)

**Mr. Hill**:  Your Honor, I've spoken with my client and he is not going to testify.

**The Court**:  Okay.

**Mr. Hill**:  So we're not going to be presenting any evidence.

**The Court**:  Okay.  Mr. Williams, you're already under oath. Let me have you stand up.  You've had an opportunity today and probably on times before to talk with your attorney about the fact that it is up to the State to prove the case against you beyond a reasonable doubt, do you understand that?

**Defendant**:  Yes, ma'am.

**The Court**:  And you have an absolute right to remain silent, do you understand that?

**Defendant**:  Yes, ma'am.

**The Court**:  You don't have to put on any evidence.

**Defendant**:  I understand that.

**The Court**:  And essentially if the State doesn't meet that burden, they don't meet the burden, you understand that?

**Defendant**:  Yes, ma'am.

**The Court**:  And there are pros and cons, good things and bad things about testifying and not testifying and have you talked to him about those things?

**Defendant**:  Yes, ma'am.

**The Court**:  And you understand that if you choose to testify that the jury, you would be subject to cross-examination by Mr. Rimmer?

**Defendant**:  Yes, ma'am.

**The Court**: And, of course, I'm going to instruct the jury that they are not to consider the fact that you did not testify, do you understand that?

**Defendant**: Yes, ma'am.

**The Court**: And after consulting with Mr. Hill, is it your decision that you want to remain silent and not testify?

**Defendant**: Yes, ma'am.

**The Court**: Are you satisfied with the defense that Mr. Hill has put on this case [sic]?

**Defendant**: Yes, ma'am.[FN 46]

As previously noted, "An appellate is not entitled to go behind sworn representations made to the court in a postconviction proceeding [ ]." Davis, 938 So. 2d at 557. The record clearly demonstrates that Defendant made an informed choice regarding his right to testify, and was given ample opportunity to address any concerns that he had with the Court. Accordingly, he is not entitled to relief on the basis of his sixth claim.

[FN 46, reference to trial transcript]

(Ex. M at 72–73).

Petitioner argued this issue on appeal of the circuit court's decision (Ex. P). The First DCA affirmed without written opinion (Ex. U).

"Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629, 52 L. Ed. 2d 136 (1977) (citations omitted). In the instant case, Petitioner stated under oath that he decided, after consulting with counsel, that he wanted to remain silent and not testify, and he was satisfied with the defense presented by defense counsel (Ex. B at 151–53). This sworn statement undermines Petitioner's after-the-fact assertion that he wanted to testify in his own defense. Further, the fact that Petitioner expressed no concerns about his decision not to testify or Mr. Hill's presentation of his defense, when the trial court gave him an opportunity to so, undermines his present allegations that Mr. Hill threatened to quit if he testified. In light of the record, the state court reasonably concluded Petitioner failed to show that

his decision not to testify was the product of ineffective assistance of counsel.  Therefore, Petitioner is not entitled to relief on Ground Three.

      D.    <u>Ground Four</u>:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of counsel based on counsel's inadequate pre-trial investigation and preparation."

Petitioner contends defense counsel failed to adequately prepare himself for cross-examination of two State witnesses, Mr. Hatten (a jailhouse informant) and Christine Snyder (the victim's mother) (doc. 1 at 8–10).  With regard to Mr. Hatten, Petitioner states Hatten claimed that Petitioner discussed the case with him when they were together on the recreation yard of the county jail (*id.* at 9).  Petitioner asserts Hatten testified Petitioner told him he (Petitioner) and the co-defendants went to the Snyders's home to get drugs and money, and the murder was not supposed to happen (*id.*).  Petitioner asserts he never spoke to Hatten about the case (*id.*).  Further, he and Hatten never had an opportunity to discuss the case, because they were housed on entirely separate floors at the jail and never went to the recreation yard together (*id.*).  Petitioner contends defense counsel should have investigated the housing logs and recreation logs at the jail, which would have shown (1) he and Hatten were not housed together and did not go to the recreation yard together, and (2) Hatten was housed with and went to the recreation yard with Petitioner's co-defendants, which was the source of Hatten's information (*id.*).  Petitioner concedes Hatten's testimony was somewhat beneficial, because it corroborated Petitioner's position that he did not intend the death of the victim (*id.*).  However, he contends the testimony was also damaging to the defense, because it incorrectly informed the jury that Petitioner went to the victim's house with the intent to get money and drugs, which erroneously implied he intended to participate in a burglary and/or robbery (*id.*).

With regard to Ms. Snyder, Petitioner asserts she testified that Petitioner and the victim worked together at Food World (doc. 1 at 9).  Petitioner asserts he never worked at Food World, although he admits he knew the victim very briefly when they were twelve (12) years old (six years prior to the offenses) (*id.*).  Petitioner asserts the State used the testimony that he worked at Food World to suggest he knew the vehicle that the victim drove (*id.*).  The State then argued Petitioner knew the victim was at home and knew there was a possibility she could be injured during the burglary or robbery (*id.*).  Petitioner contends defense counsel should have investigated the fact that

he did not work with the victim or know the type of vehicle she drove at the time of the offense (*id.*). He contends had counsel investigated the jail logs and Food World employment records and used the information to impeach the testimony of Mr. Hatten and Ms. Snyder, there is a reasonable probability the result of trial would have been different (*id.* at 9–10).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 34).  Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 34–39).

        1.        Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

        2.        Federal Review of State Court Decision

Petitioner raised this claim as Ground VII in his Rule 3.850 motion (Ex. I at 27–30).  The state circuit court denied the claim on the following grounds:

> In his seventh claim, Defendant alleges that counsel was ineffective for failing to properly and adequately investigate and prepare for trial in two significant ways.  First, Defendant alleges that he asked trial counsel to procure jail records to prove that Defendant never had the opportunity to make a statement to witness Hatten. Secondly, Defendant also states that he told counsel that he never worked with Jessica Snyder, the murder victim, at Food World, as testified to by her mother, Christine Snyder, and that he requested that counsel speak with the store manager and personnel manager and call them to testify to that fact.  In his related eighth claim, Defendant alleges that counsel was ineffective for failing to properly cross-examine Hatten and Christine Snyder in regard to these issues.[FN 47]

> Although Defendant asserts that jail records were available which would support his claim that he never made a statement to Hatten, Defendant has failed to state with specificity what records he believes should have been produced, nor has he produced them himself in support of his claims.  Defendant has further failed to demonstrate prejudice, in that he has failed to demonstrate that a different result would have been obtained at his trial, even if the purported jail records had been produced and Hatten cross-examined as to the truthfulness of his testimony.  In essence, Hatten testified that Defendant told him he went to the victim's home to get drugs and money, and that the murder was not supposed to happen.[FN 48]  Such testimony is largely consistent with Investigator Sanderson's testimony that Defendant admitted to him that he went to the victim's home to get drugs and that he entered the home after the co-defendants kicked in the door, but had nothing to do with the actual murder.[FN 49]  Additionally, counsel used Hatten's testimony

to bolster the defense of independent act, in that Hatten was able to testify to Defendant's statements about his lack of intent to harm the victim and his lack of participation in her killing without subjecting Defendant to cross-examination.[FN 50]  In response to counsel's questioning, Hatten said that Defendant had nothing to do with the victim's death and that she was not supposed to be at the home at the time of the incident.[FN 51]  Defendant has failed to show a reasonable probability that the outcome would have been different but for counsel's alleged deficiency regarding Hatten, and he is not entitled to relief.

A similar analysis applies to the allegedly deficient treatment at trial of Christine Snyder's testimony.  Defendant alleges that counsel should have called witnesses to contradict Ms. Snyder's testimony and demonstrate that he never worked with the victim at Food World.

Defendant has failed to demonstrate that further cross-examination of Ms. Snyder as to whether Defendant worked with her daughter would have rendered a different result at trial.  Defendant claims this is a crucial point because the testimony was used to support the argument that Defendant recognized her car and knew she was at home.  However, Defendant does not deny in his motion that he knew Jessica, [FN 52] only that he worked with her at Food World.  In fact, in a previous claim in the instant motion, Defendant states, "Defendant went to the house to get weed, which could mean that he expected to buy marijuana or that Defendant expected Jessica [victim] to give it to him. . . . The Defendant left and came back because Jessica didn't want to sell marijuana while her little sister was at home."[FN 53]  If true, this statement suggests that Defendant did in fact expect Jessica to be there when he returned.[FN 54]

Furthermore, the testimony of other witnesses also suggests that Defendant and the victim were acquainted.  The victim's younger sister testified at trial that Defendant came to the home earlier the day of the incident and that Jessica came to the door and told him and the co-defendants that she had to go to work at 10 a.m.[FN 55]  The younger sister also testified that she recognized one of the men at the door as "Donnie."[FN 56]  Ms. Snyder also testified that she knew Defendant, an allegation which Defendant does not deny.[FN 57]

In addition, Defendant has failed to demonstrate that counsel would have been able to call additional witnesses to refute Ms. Snyder's testimony about whether the victim worked with Defendant.[FN 58]  "A witness's answer during cross-examination to a nonmaterial collateral matter is conclusive and cannot be impeached by normal means of impeachment, including contradictory testimony by another witness." Lawson v. State, 651 So. 2d 713, 715 (Fla. 2d DCA 1995), citing Dupont v. State, 556 So. 2d 457 (Fla. 4th DCA 1990).  "The test is whether the proposed testimony can be admitted into evidence for any purpose independent of

the contradictions." <u>Id.</u>  Defendant has failed to demonstrate that the testimony of additional witnesses regarding whether he worked at Food World with the victim would have been admissible for any alternative purpose other than contradicting Ms. Snyder, and would not have demonstrated that Defendant did not know the victim. Defendant has failed to demonstrate that counsel's performance was ineffective, or that the results would have been any different had counsel proceeded differently with regard to the testimony of Christine Snyder.  Therefore, Defendant is not entitled to relief on the basis of his seventh and eighth claims.

[FN 47:  omitted]

[FN 48–51:  references to trial transcript]

FN 52:    In fact, Investigator Sanderson testified that Defendant told him that he knew the victim as Jessica.   <u>See</u> Attachment 3, trial transcript, page 140.

[FN 53:  reference to Petitioner's Rule 3.850 motion]

FN 54:  The Court also questions why Defendant would expect someone he did not know to give him drugs.

[FN 55–57:  references to trial transcript]

FN 58:  <u>See</u> Attachment 3, trial transcript, page 106.  Counsel did, in fact, question Ms. Snyder about whether Defendant worked with her daughter.

(Ex. M at 73–77).

Petitioner argued this issue on appeal of the circuit court's decision (Ex. P).  The First DCA affirmed without written opinion (Ex. U).

The state court's findings of fact with respect to testimony adduced at trial and defense counsel's cross-examination of Mr. Hatten and Ms. Snyder is supported by the trial transcript (Ex. B).  As to counsel's failure to impeach Mr. Hatten, the state court correctly found that Mr. Hatten's testimony was largely consistent with Investigator Sanderson's testimony that Petitioner admitted he went to the victim's home to get drugs and entered the home after the co-defendants kicked in the door, but he had nothing to do with the actual murder.  In response to defense counsel's questioning, Hatten testified Petitioner stated he had nothing to do with the victim's death, and she

was not supposed to be at the home at the time of the incident.  This testimony strengthened the independent act defense, because it suggested Petitioner's lack of intent to harm the victim and lack of participation in her killing, without Petitioner subjecting himself to cross-examination by the prosecutor.  In light of the beneficial nature of Mr. Hatten's testimony, it was reasonable for defense counsel to refrain from impeaching his testimony with evidence that he and Petitioner never actually had contact at the jail.

With regard to counsel's failure to impeach Ms. Snyder's testimony with evidence that Petitioner did not work with the victim at Food World, the state court determined that employment records or testimony from Food World personnel would not have been admissible impeachment evidence under state law.  A determination that certain evidence was not admissible under Florida's evidentiary rules is solely within the province of the Florida courts.  "[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."  Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886, 44 L. Ed. 2d 508 (1975) ("State courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law) (citations and footnote omitted); Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983).  In light of the state court's determination that state evidentiary rules prohibited defense counsel from admitting impeachment evidence on the collateral matter of whether Petitioner was in fact employed at Food World, Petitioner failed to show deficient performance by counsel, or that there is a reasonable probability that the trial court would have properly admitted the evidence if counsel had sought to introduce it.  Additionally, there is no reasonable probability the result of trial would have been different had defense counsel introduced evidence that Petitioner did not work with the victim at Food World.  The jury heard, through the testimony of Investigator Sanderson and the victim's 12-year-old sister, evidence that Petitioner knew the victim and knew that she would be home when he and the co-defendants returned to the house to get marijuana.  Therefore, Petitioner failed to show he was prejudiced by counsel's failure to impeach Ms. Snyder with evidence that Petitioner did not work at Food World.

Petitioner failed to demonstrate that the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to habeas relief on Ground Four.

> E.    Ground Five:  "Petitioner was denied his Sixth amendment right under the U.S. Constitution to the effective assistance of counsel based upon the cumulative errors of trial counsel."

Petitioner contends each of the errors by counsel identified in Grounds One through Four *supra* warrant federal habeas relief (doc. 1 at 10).  He contends the cumulative effect of these errors "increased the prejudice of the claims exponentially" (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 39–40).  Respondent contends no Supreme Court authority recognizes ineffective assistance of counsel "cumulative error" as a freestanding constitutional violation (*id.* at 40).  Respondent argues none of the alleged errors of trial counsel, considered alone, satisfies the threshold standard of ineffective assistance of counsel; therefore, there are no errors to accumulate (*id.* at 40–41).  Thus, the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 41).

In Ground XII of Petitioner's Rule 3.850 motion, he argued that the cumulative effect of defense counsel's errors amounted to ineffective assistance of counsel in violation of his constitutional rights (Ex. I at 43–44).  The state circuit court denied the claim on the ground that Petitioner's individual claims had no basis for relief; therefore, his claim of cumulative error failed (Ex. M at 79).

The Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims.[5]  Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves

---

[5] The Eleventh Circuit has noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel."  Forrest v. Fla. Dep't of Corr., 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished).  The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."  *Id.* at 5 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[6] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254.  *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[7]

_____

[6] *See* United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995)), United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)).

[7] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas.  The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas.  *See* Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims.  *See* Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007).  The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue.  *See* Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland.  *See* Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors.  *See* <u>United States v. Waldon</u>, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); <u>United States v. Barshov</u>, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); <u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit.  We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it.  Twenty times zero equals zero."); *see also* <u>United States v. Hall</u>, 455 F.3d 508, 520 (5th Cir. 2006); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); <u>United States v. Hardy</u>, 224 F.3d 752, 757 (8th Cir. 2000); <u>Angelone</u>, *supra*; <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1113 (10th Cir. 1998); <u>United States v. Rivera</u>, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); <u>United States v. Conteh</u>, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007).  Thus, Petitioner must show error with respect to at least two of his individual claims.

As previously discussed, none of the alleged errors of trial counsel, considered alone, approaches the threshold standard of ineffective assistance of counsel.  Taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or a fundamentally fair trial.  Therefore, Petitioner is not entitled to federal habeas relief on this "cumulative error" claim.  *See* <u>Bronstein v. Wainwright</u>, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted)); <u>Ballard v. McNeil</u>, 785 F. Supp. 2d 1299, 1335–37 (N.D. Fla. 2011); *see also* <u>Files v. Tucker</u>, No. 3:09cv490/RV/EMT, 2011 WL 6983135, at *28–30 (N.D. Fla. Dec. 9, 2011) (unpublished), *Report and Recommendation Adopted at* 2012 WL 83369 (N.D. Fla. Jan. 11, 2012); <u>Rasley v. Buss</u>, No. 5:08cv368/RH/EMT, 2011 WL 2358650, at *32–32 (N.D. Fla. Apr. 11, 2011) (unpublished), *Report and Recommendation*

*Adopted at* 2011 WL 2293383 (N.D. Fla. June 9, 2011); Whitfield v. McNeil, No. 5:07cv120/RS/EMT, 2010 WL 1930007, at *22–23 (N.D. Fla. Apr. 12, 2010) (unpublished), *Report and Recommendation Adopted at* 2010 WL 1930012 (N.D. Fla. May 13, 2010); Walls v. McNeil, No. 3:06cv237/MCR/EMT, 2009 WL 3187066, at **30–31 (N.D. Fla. Sept. 30, 2009) (unpublished).

> F.    Ground Six:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of appellate counsel based on counsel's failure to raise a double jeopardy issue on appeal."

Petitioner contends appellate counsel was ineffective for failing to argue that Petitioner's convictions and sentences for burglary of an occupied dwelling with assault or battery and while armed (Count 2) and robbery with a firearm (Count 3) violated the prohibition against double jeopardy (doc. 1 at 10–11).  He contends the robbery element of the burglary and the independent robbery charge both involved the same "taking," that is, the taking of a safe and its contents; therefore, his convictions for both crimes constituted double jeopardy (*id.* at 11).  Petitioner acknowledges the double jeopardy argument was not preserved in the trial court (*id.*).  However, he contends the error was fundamental and, therefore, could have been raised by appellate counsel despite the lack of preservation (*id.*).  He contends had appellate counsel raised the issue, there is a reasonable probability the robbery conviction would have been vacated (*id.*).  He further contends the felony murder conviction would have been vacated if the robbery conviction was vacated, because there was no jury finding as to whether the felony murder conviction was based upon the underlying burglary or robbery felony (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 26 at 42).  Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 43–50).

> 1.    Clearly Established Federal Law

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  *See* Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted).  As previously noted,

the two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other.  Strickland, 466 U.S. at 697.  The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances."  Id. at 691.  Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal.  Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal.  See Robbins, 528 U.S. at 285.

    The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel.  Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).  Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  Diaz v. Sec'y Dep't of Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005); Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.  Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)).

    2.    Federal Review of State Court Decision

    In Petitioner's state habeas petition, he argued appellate counsel was ineffective for failing to argue that fundamental error occurred at trial when he was convicted and sentenced for both burglary of an occupied dwelling with assault or battery and while armed and robbery with a firearm, because both offenses involved the same "taking" (Ex. BB at 2–5).  The First DCA denied the petition on the merits (Ex. EE).  The state court did not cite Strickland; however, as previously

noted, a state court need not cite to, nor even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8.

The First DCA's decision could have been supported by the argument that no double jeopardy violation occurred.  Article I, Section 9 of the Florida Constitution provides, in relevant part, "No person shall . . . be twice put in jeopardy for the same offense." Art. I, § 9, Fla. Const. Additionally, the Fifth Amendment to the United States Constitution provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V. "The scope of the Double Jeopardy Clause is the same in both the federal and Florida Constitutions." Trotter v. State, 825 So. 2d 362 (Fla. 2002).

The Double Jeopardy Clause embodies three separate guarantees:  "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 307–08 (1984) (citation and footnote omitted).  "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983); Whalen v. United States, 445 U.S. 684, 689, 100 S. Ct. 1432, 1436, 63 L. Ed. 2d 715 (1980) ("The Double Jeopardy Clause at the very least precludes . . . courts from imposing consecutive sentences unless authorized by [the legislature] to do so."); Albernaz v. United States, 450 U.S. 333, 344, 101 S. Ct. 1137, 1145, 67 L. Ed. 2d 275 (1980) (stating, "the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed.  Where [the legislature] intended . . . to impose multiple punishments, imposition of such sentence does not violate the Constitution."); Brown v. Ohio, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225, 53 L. Ed. 2d 187 (1977) (noting "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.").

"Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense." Garrett v. United States, 471 U.S. 773, 778, 105 S. Ct. 2407, 2411, 85 L. Ed. 2d

764 (1985)).  Although the Double Jeopardy Clause does not flatly prohibit the legislature from punishing the same conduct under two different statutes, federal courts assume that the legislature ordinarily does not intend to do so "'in the absence of a clear indication of contrary legislative intent.'"  Hunter, 459 U.S. at 366 (quoting Whalen, 445 U.S. at 691–92); *see also* Garrett, 471 U.S. at 779 (holding that multiple punishments are permissible "when the legislative intent is clear from the face of the statute or the legislative history"); Ohio v. Johnson, 467 U.S. 493, 499 n.8, 104 S. Ct. 2536, 2541 n.8, 81 L. Ed. 2d 425 (1984) ("[I]f it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." (emphasis added)).  If no clear intention is evident, the provisions are analyzed under the "same elements" test announced in Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856, 125 L. Ed. 2d 556 (1993).  Although the court will decide under federal law whether a double jeopardy violation has occurred, it must accept the Florida courts' interpretation of the state's own statutes.  Hunter, 459 U.S. at 368.

The Eleventh Circuit summarized its interpretation of Supreme Court law regarding double jeopardy as follows:

> To summarize, our review of a potential double jeopardy violation arising from a single prosecution is a two-stage analysis.  First, we ascertain whether there exists a clear legislative intent to impose cumulative punishments, under separate statutory provisions, for the same conduct.  If a clear indication of such intent exists, our inquiry is at an end and the double jeopardy bar does not apply.  If there is no clear indication of legislative intent to impose cumulative punishments, we examine the relevant statutes under the same-elements test of Blockburger.  Under that test, if each statutory offense requires proof of an element not contained in the other, the offenses are not the "same" and double jeopardy is no bar to cumulative punishment.

Williams v. Singletary, 78 F.3d 1510, 1513 (11th Cir. 1996).

The relevant Florida statutes specifying the separate offenses of burglary of an occupied dwelling with assault or battery and while armed and robbery with a firearm are sections 810.02(1)(b), (2)(a), (b) and 812.13(2)(a), respectively.  At the time of Petitioner's offense conduct, Florida Statutes § 810.02 provided, in relevant part:

(1)(a). . . . .

(b) For offenses committed after July 1, 2001, "burglary" means:

1.  Entering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, . . . .

(2)  Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084, if, in the course of committing the offense, the offender:

(a)  Makes an assault or battery upon any person; or

(b)  Is or becomes armed within the dwelling, structure, or conveyance, with explosives or a dangerous weapon; . . .

Fla. Stat. § 810.02(1)(b), (2)(a), (b) (2001)

Florida Statutes § 812.13 provided, in relevant part:

(1)  "Robbery" means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

(2)(a)  If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 812.13(1), (2)(a) (2001).

Neither of those statutory provisions indicates whether the Florida legislature authorized cumulative sentences where both statutes are offended in a single criminal episode.  Therefore, rules of statutory construction must be applied to help determine legislative intent.

The Florida legislature set forth rules of construction in Florida Statutes section 775.021. That provision provides, in relevant part:

(1) The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.

(2) The provisions of this chapter are applicable to offenses defined by other statutes, unless the code otherwise provides.

. . . .

(4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively. For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.

(b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection (1) to determine legislative intent. Exceptions to this rule of construction are:

1. Offenses which require identical elements of proof.

2. Offenses which are degrees of the same offense as provided by statute.

3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Fla. Stat. § 775.021 (2003).  Based upon this language, it is clear that the Florida Legislature expressly intended to convict and sentence a defendant for each offense he commits during the course of a single criminal episode, with three exceptions to that rule.  Fla. Stat. § 775.021(4)(b). The exceptions adopt the <u>Blockburger</u> test.  *See* <u>State v. Weller</u>, 590 So. 2d 923, 925 (1991).

Petitioner has failed to show that the offenses in the instant case satisfy the first exception. At the time of Petitioner's offense conduct, March 10, 2003 (*see* Ex. A), the offense of burglary of an occupied dwelling with assault or battery and while armed had the following six elements:

1. Defendant entered a structure owned by or in the possession of one of the Snyders;

2. At the time of entering the structure, Defendant had the intent to commit a theft or robbery in that structure;

3. In the course of committing the burglary, Defendant assaulted or battered Jessica Snyder;

    4.  In the course of committing the burglary, Defendant was armed or armed himself within the structure with a dangerous weapon;

    5.  The structure was a dwelling; and

    6.  In the course of committing the burglary, there was another human being in the dwelling at the time he entered the dwelling.

*See* The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two:  Instruction on Crimes, Chapter 13.1 Burglary (2002).

The offense of robbery with a firearm had the following five elements:

    1.  Defendant took a safe and its contents from the person or custody of one of the Snyders;

    2.  Force, violence, assault, or putting in fear was used in the course of the taking;

    3.  The property taken was of some value;

    4.  The taking was with the intent to permanently or temporarily deprive one of the Snyders of his or her right to the property or any benefit from it, or to appropriate the property to Defendant's own use or to the use of any person not entitled to it; and

    5.  In the course of committing the robbery, Defendant carried a firearm.

*See* The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two:  Instruction on Crimes, Chapter 15.1 Robbery (2002).

The crime of burglary of a dwelling required the entering of a dwelling with the intent to commit an offense therein, which was not an element of robbery.  Further, the crime of robbery required proof of a taking, which was not an element of burglary of a dwelling.  Therefore, the first <u>Blockburger</u> exception does not apply to Petitioner's convictions of burglary and robbery.  *See* <u>McAllister v. State</u>, 718 So. 2d 917 (Fla. 5th DCA 1998) 1998) (holding that defendant's conviction for robbery was not subsumed in his conviction for burglary of a conveyance with assault or battery for double jeopardy purposes); <u>George v. State</u>, 509 So. 2d 972 (Fla. 5th DCA 1987) (defendant's convictions and sentences for attempted first degree felony murder, burglary with assault, attempted armed robbery, shooting within building, and use of firearm during commission of felony, arising

out of single criminal episode, did not violate double jeopardy where none of offenses were included offenses of the others); Madry v. State, 448 So. 2d 8 (Fla. 5th DCA 1984) (offenses of armed burglary and armed robbery are substantively different and can never be "the same offense" within the meaning of the constitutional double jeopardy prohibition).[8]

Furthermore, the second Blockburger exception is not satisfied because neither of the crimes is a degree of the other.  Moreover, according to the tables of lesser included offenses included with each individual jury instruction, the third exception is not satisfied because robbery is not a lesser included offense of burglary, and burglary is not a lesser included offense of robbery.

Finally, because burglary of a dwelling with assault or battery and while armed and robbery with a firearm were not the same crime, either of them could have served as the underlying offense of felony murder without his convictions of both violating double jeopardy.  See Davis v. State, 467 So. 2d 1094, 1095 (Fla. 1st DCA 1904) (underlying offense of attempted felony-murder charge, simple robbery, was not same crime as separate charge of armed robbery, so that constitutional prohibition against double jeopardy was not violated by convictions on both charges).  Moreover, Petitioner's conviction of felony murder and the underlying felony does not violate double jeopardy.  See State v. Enmund, 476 So. 2d 165, 167–68 (Fla. 1985) (holding a defendant can be convicted of and sentenced for both felony murder and the underlying felony).

Because Petitioner's double jeopardy argument is reasonably considered to be without merit, appellate counsel's failure to brief the issue was not deficient, and Petitioner was not prejudiced by counsel's failure to raise it.  Therefore, Petitioner failed to demonstrate that the First DCA's rejection of his claim of ineffective assistance of appellate counsel was contrary to or an unreasonable application of clearly established federal law.

G.      Ground Seven:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to the effective assistance of appellate counsel based on counsel's failure to

_____

[8] Petitioner would have had a meritorious double jeopardy argument if he had been convicted of home-invasion robbery, a violation of Florida Statutes § 812.135 and burglary of a dwelling, but he was not.  See Davis v. State, 74 So. 3d 1096, 1097 (Fla. 1st DCA 2011); Bowers v. State, 679 So. 2d 340, 341 (Fla. 1st DCA 1996); Elmy v. State, 667 So. 2d 392, 392 (Fla. 1st DCA 1995); Perez v. State, 951 So. 2d 859, 859–60 (Fla. 2d DCA 2006); see also McAllister, 718 So. 2d at 918 (recognizing home-invasion robbery as a form of burglary).

argue the trial court's err [sic] in admitting photographs into evidence at trial over trial counsel's objection."

Petitioner contends appellate counsel should have argued on appeal that the trial court erred by admitting photographs of the deceased victim at the crime scene, over defense counsel's objection (doc. 1 at 12). Petitioner argues the photographs were irrelevant to any issue in the case; he asserts premeditation was not an issue in the case, nor was the nature or extent of the victim's injuries, the location of her body, or the manner or cause of her death (*id.*). Further, he contends the photographs were extremely prejudicial because they were gruesome (*id.*). Petitioner contends there is a reasonable probability the outcome of his appeal would have been different if appellate counsel had raised this issue of trial court error.

Respondent concedes Petitioner exhausted this claim (doc. 26 at 51). Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 51–59).

      1.     Clearly Established Federal Law

The clearly established federal standard governing this claim is set forth *supra* in Ground Six.

      2.     Federal Review of State Court Decision

In Petitioner's state habeas petition, he argued the same issue he raises here (Ex. BB at 13–15). The First DCA denied the petition on the merits (Ex. EE).

The trial record shows that the prosecutor sought to admit four photographs as Exhibit 2, marked Exhibits 2A–2D (Ex. B at 52; Ex. ZZ). Exhibit 2A was an autopsy photograph showing the extent and nature of the victim's injuries (*id.*). Defense counsel objected to the admission of only this photograph, on the grounds that it was highly prejudicial, and that other crime scene photographs depicted the victim's injuries (*id.* at 53). The trial court overruled the objection (*id.*). During the medical examiner's testimony, she described the victim's injuries as follows:

> She had several injuries of the head and neck. We call the types of injuries that she had blunt injuries. They include contusions which are bruises, abrasions, which are scrapes and scratches of the skin, and lacerations, which are actual breaks of the skin not done with a knife or a sharp object but done with a blunt object.

. . . .

      She had such severe injuries that her head was actually, the shape of her head was actually distorted.  She had inwardly displaced fractures of the face, severe distortion of the features of the face.  For example, the eyes were not even visible.  There was basically a large laceration here which created a sort of a cavitation of her face.  She had lacerations of the brain.  She had shattering of the skull and several teeth were broken and missing and she also had some abrasions and contusions of the skin of her extremities or the arms and legs.

. . . .

      The cause of death was blunt impact of head and neck and manner of death is homicide.

(Ex. B at 145–46).  The medical examiner testified the victim's injuries were consistent with being beaten with the butt of the shotgun found in the kitchen sink (*id.* at 147).  She also testified that an injury to the back of the victim's left hand was consistent with her putting her hand up in a defensive manner (*id.*).  The prosecutor showed Exhibits 2A–2D to the medical examiner, and she testified the photographs accurately showed the injuries she described in her testimony (*id.* at 146–47).  Defense counsel stated, "Judge, I need to renew my objection to State's Exhibit No. 2." (*id.* at 148).  The trial court again overruled the objection and admitted Exhibits 2A–2D into evidence (*id.*).

      Assuming arguendo that defense counsel preserved the issue of the admission of all four photographs included in Exhibit 2, Petitioner failed to show appellate counsel had a reasonable basis to argue the trial court abused its discretion by admitting the photographs.  Under Florida law, a trial court's ruling on the admission of photographic evidence will not be disturbed absent a clear showing of abuse of discretion.  *See* Davis v. State, 859 So. 2d 465, 477 (Fla. 2003) (citing Mansfield v. State, 758 So. 2d 636, 648 (Fla. 2000)).  The test for admissibility of photographic evidence is relevancy.  Pope v. State, 679 So. 2d 710, 713 (Fla. 1996).  "Photographs are admissible if they are 'relevant and not so shocking in nature as to defeat the value of their relevance.'"  *Id.*  Admission of allegedly gruesome photographs is appropriate where they are independently relevant or corroborative of other evidence.  Grey v. State, 727 So.  2d 1063 (Fla. 4th DCA 1999).  Photographs which bear on the issues of the nature and extent of the injuries, the nature and force of the violence used, premeditation or intent are relevant.  *Id.*; *see also*, Wilson v. State, 436 So. 2d 908 (Fla. 1983) (finding no abuse of discretion in admission of autopsy photographs of victim where they were relevant to manner of death, nature of force and violence used, and premeditation); Lott

v. State, 695 So. 2d 1239, 1243 (Fla. 1997) (affirming the trial court's ruling admitting crime scene photographs because they were relevant to support the charge of premeditated murder); King v. State, 545 So. 2d 375, 378 (Fla. 4th DCA 1989) (finding no error in admission of close-up photograph of victim as she appeared at scene of incident because photograph was relevant to issue of whether victim's death was intentionally or accidentally caused); Walker v. State, 665 So. 2d 1070 (Fla. 4th DCA 1995) (finding no error in admission of photographs where they assisted the medical examiner in his explanation of the victim's wounds and were relevant to the issue of premedition); Lewis v. State, 566 So. 2d 270 (Fla. 2d DCA 1990) (finding no abuse of discretion in admission of photographs of victim where they were relevant as circumstantial evidence of premeditation).

Contrary to Petitioner's argument, premeditation was an issue at this trial—the State charged him alternatively with premeditated murder or felony murder (Ex. A). As previously discussed, under Florida law, the photographs were relevant to the issue of premeditation.

Additionally, by overruling defense counsel's objection, the trial court determined that the prejudicial effect of the pictures did not outweigh their probative value. Where there is an element of relevancy to support admissibility, then the trial judge in the first instance, and the court on appeal, must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and detract them from a fair and unimpassioned consideration of the evidence. *See* Leach v. State, 132 So. 2d 329, 331–32 (Fla. 1961). In the instant case, although the medical examiner was able to describe the nature and extent of the victim's wounds and the manner and cause of her death, she did not provide an opinion as to whether the death was premeditated. The prosecutor used the photographs to argue to the jury that the nature and manner of the wounds inflicted were consistent with an angry attack by Petitioner's co-defendant, and Petitioner was a principal to that attack (Ex. B at 180–87). In such circumstances, Florida courts have held that the trial court's admission of such photographs, including autopsy photographs, was not an abuse of discretion. *See, e.g.*, Wilson, 436 So. 2d at 910 (finding no abuse of discretion in admitting nine autopsy photographs); Grey v. State, 727 So. 2d 1063 (Fla. 4th DCA 1999) (upholding the trial court's decision to admit photographs of the deceased victim showing her frontal head injuries and extending down far enough to show her naked breasts and photographs

depicting the victim's scalp and hair placed on a styrofoam mannequin head); Vargas v. State, 751 So. 2d 665 (Fla. 3d DCA 2000) (finding no abuse of discretion to admit photographs of victims where medical examiner used them during his testimony to illustrate the nature of the wounds and the element of premeditation for the first degree murder charges); Lott, 695 So. 2d at 1239 (finding no abuse of discretion where photographs were probative of premeditated murder charge).

The First DCA's denial of Petitioner's ineffective assistance of appellate counsel claim could have been based upon the theory that Petitioner's claim of trial court error was reasonably considered to be without merit; therefore, counsel was not deficient for failing to raise it, and Petitioner suffered no prejudice from counsel's failure to do so. The First DCA's adjudication of the claim was not contrary to or an unreasonable application of Strickland. Therefore, Petitioner is not entitled to habeas relief on Ground Seven.

IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Kenneth S. Tucker is substituted for Edwin G. Buss as Respondent.

And it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 30<u>th</u> day of April 2012.


/s/ *Elizabeth M. Timothy*                                    
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** <u>United States v. Roberts</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**